1 Brett Duxbury, Calif. Bar No. 155268
2 brettduxbury@mac.com
3 P.O. Box 1938
4 Kernville, CA 93238
5 760.376.1905
6 Attorney for Plaintiff KERN RIVER BOATERS
7
8
9 **UNITED STATES DISTRICT COURT**
10 **EASTERN DISTRICT OF CALIFORNIA**
11 **FRESNO DIVISION**
12
13

| | |
|---|---|
| 14 KERN RIVER BOATERS, | Case No. _____ |
| 15             Plaintiff, | |
| 16 | |
| 17    vs. | |
| 18 | **COMPLAINT FOR** |
| 19 UNITED STATES FOREST SERVICE; | **DECLARATORY AND** |
| 20 TOM SCHULTZ, Chief of the U.S. Forest | **INJUNCTIVE RELIEF** |
| 21 Service; JASON KUIKEN, Acting Regional | |
| 22 Forester, Pacific Southwest Region; | (No hearing scheduled) |
| 23 ANTHONY EDWARDS, Forest Supervisor, | |
| 24 Sequoia National Forest; NANCY CHAPMAN, | |
| 25 District Ranger, Kern River Ranger | |
| 26 District; and BROOKE ROLLINS, Secretary | |
| 27 of Agriculture, all in their official capacities, | |
| 28             Defendants. | |

29
30
31 **INTRODUCTION**

32 1.     This action challenges the United States Forest Service's ("Forest

33 Service") May 7, 2025 approval of the Kern River Hatchery Siphon

34 Replacement Project ("Siphon Project") under a categorical exclusion from the

35 National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370h, and

36 without conducting the analysis required by the Wild and Scenic Rivers Act

37 ("WSRA"), 16 U.S.C. §§ 1271–1287.

1    2.    The Siphon Project, located on Forest Service lands just downstream of

2    the segment of the North Fork Kern River ("NFKR") designated as Wild and

3    Scenic, would enable the California Department of Fish & Wildlife ("CDFW")

4    to resume operations at the Kern River Hatchery Planting Base ("Hatchery")

5    that depend on a diversion of 40 cubic feet per second ("cfs") of cold water

6    released from Southern California Edison's ("SCE") Fairview Dam and routed

7    through the federally licensed Kern River No. 3 hydroelectric facility

8    ("KR3"). During low-flow months in dry years, delivering this 40 cfs to the

9    Hatchery often reduced flows in the fifteen-mile Wild and Scenic River

10    segment below levels that would otherwise be afforded pursuant to the KR3

11    Minimum Instream Flow ("MIF") regime. Reducing river flows below the MIF

12    during the hottest months of the year impairs fisheries, recreation, scenery,

13    and other Outstandingly Remarkable Values ("ORVs") for which Congress

14    protected the NFKR as detailed in ¶ 33 below.

15    3.    By approving construction of the Siphon Project under a categorical

16    exclusion, 36 C.F.R. § 220.6(e)(3), the agency unlawfully ignored reasonably

17    foreseeable indirect and cumulative impacts from the project on the Wild and

18    Scenic NFKR, including impacts on sensitive riverine wildlife, public

19    recreation, and aesthetics, in violation of NEPA. It also failed to prepare the

20    mandatory determination under §7 of the WRSA that the Siphon Project will

21    not indirectly invade or unreasonably diminish the river's free-flowing

22    condition or ORVs.

1    4.    Plaintiff Kern River Boaters ("KRB") is a nonprofit membership

2    organization of kayakers, rafters, anglers, and conservationists who rely on

3    the 15 miles of the NFKR below Fairview Dam for recreation and aesthetic

4    enjoyment. KRB's members will be irreparably harmed if the Siphon Project

5    proceeds and river flows are curtailed below those that would otherwise be

6    provided under the KR3 MIF regime.

7    5.    KRB seeks declaratory and injunctive relief under the Administrative

8    Procedure Act, 5 U.S.C. §§ 701–706, to set aside the Forest Service's unlawful

9    decision, which improperly relied on a categorical exclusion, and to enjoin

10    implementation of the Siphon Project unless and until Defendants comply

11    with NEPA, the WSRA.

12

13                    **JURISDICTION AND VENUE**

14    6.    This Court has subject-matter jurisdiction under 28 U.S.C. § 1331

15    because this action arises under the laws of the United States, including

16    NEPA, 42 U.S.C. §§ 4321–4370h; the Wild and Scenic Rivers Act, 16 U.S.C.

17    §§ 1271–1287; and the Administrative Procedure Act ("APA"), 5 U.S.C. §§

18    701–706. The Forest Service's approval of the Siphon Project constitutes final

19    agency action, and Plaintiff has no further administrative remedy, rendering

20    the claims ripe for review. 5 U.S.C. § 704. The requested relief is authorized

21    by the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and by 5 U.S.C. §

22    706.

1   7.    Venue lies in this District pursuant to 28 U.S.C. § 1391(e)(1) because

2   (a) Defendant United States Forest Service resides in this District; (b) a

3   substantial part of the events or omissions giving rise to the claims occurred

4   in this District; (c) the property that is the subject of the action — the North

5   Fork Kern River and adjacent National Forest lands — is situated within this

6   District; and (d) the primary resource impacts giving rise to these claims will

7   occur in this District.

8   8.    Assignment to the Fresno Division is proper under Local Rule 120(d)

9   because the Siphon Project and its challenged approval are located in Kern

10  County, California.

11

12                          **PARTIES**

13  9.    **Plaintiff Kern River Boaters.** Plaintiff Kern River Boaters is a

14  California nonprofit public benefit corporation and a tax-exempt 501(c)(3)

15  organization. Kern River Boaters is dedicated to advocating for the

16  environmental and recreational interests of whitewater recreators in the

17  Kern River watershed, within the zone of interests protected by NEPA and

18  the WSRA. It is based in Kernville, California, and is run entirely by

19  volunteers.

20  10.   **Plaintiff's Interests in the Kern River.** Members of Kern River

21  Boaters regularly visit, boat, kayak, raft, fish, and otherwise enjoy the Kern

22  River, including the 15-mile Wild and Scenic segment of the NFKR below

23  Fairview Dam. These members derive recreational, aesthetic, and spiritual

1    benefits from the river's free-flowing condition, natural scenery, and

2    ecological integrity, and seek to protect and enhance them. The continued

3    health and preservation of this segment of the NFKR is central to Kern River

4    Boaters' mission and to the enjoyment of its members.

5    11.    **Organizational Standing.** Kern River Boaters has organizational

6    standing to bring this action on behalf of its members. The recreational and

7    aesthetic interests of KRB's members in the NFKR below Fairview Dam will

8    be directly and adversely affected by the Siphon Project approved by

9    Defendants. At least one member of KRB would have standing to sue in their

10   own right because of the Siphon Project's impacts on their use and enjoyment

11   of the river. The interests KRB seeks to protect in this action are germane to

12   the organization's mission, and neither the claims asserted nor the relief

13   requested require the participation of individual members.

14   12.    **Defendant United States Forest Service.** Defendant United States

15   Forest Service is an agency of the United States Department of Agriculture.

16   The Forest Service manages the Sequoia National Forest, including the Kern

17   River Ranger District where the Siphon Project is located. The Forest Service

18   is responsible for ensuring that projects it approves on National Forest lands

19   comply with all applicable federal laws, including the National

20   Environmental Policy Act ("NEPA") and the Wild and Scenic Rivers Act,

21   among others. The Forest Service, acting through its officials, issued the

22   decisions and approvals that are challenged in this case.

13.     **Defendant Tom Shultz, Chief of the Forest Service.** Defendant Tom Schultz is the Chief of the United States Forest Service and is sued in his official capacity. In this role, Chief Shultz is the highest-ranking official in the Forest Service and is ultimately responsible for the agency's management of the National Forests and compliance with federal environmental laws. Chief Shultz (or his delegates) had supervisory authority over the decisions at issue in this lawsuit.

14.     **Defendant Jason Kuiken, Acting Regional Forester (Region 5).** Defendant Jason Kuiken is the Acting Regional Forester for the Forest Service's Pacific Southwest Region (Region 5), which encompasses California, including the Sequoia National Forest. He is sued in his official capacity. As Acting Regional Forester, Mr. Kuiken oversees the management of all National Forests within Region 5 and is responsible for ensuring that activities and projects within those forests – including the Siphon Project – comply with applicable laws and regulations.

15.     **Defendant Anthony "Tony" Edwards, Forest Supervisor of Sequoia National Forest.** Defendant Anthony Edwards is the Forest Supervisor for the Sequoia National Forest and is sued in his official capacity. As Forest Supervisor, Mr. Edwards is responsible for the administration and management of the Sequoia National Forest, including the approval of projects and activities on that forest's lands. Mr. Edwards

1    was responsible for overseeing or approving the Siphon Project within the

2    Sequoia National Forest and ensuring its compliance with federal law.

3    16.    **Defendant Nancy Chapman, District Ranger, Kern River**

4    **Ranger District.** Defendant Nancy Chapman is the current District Ranger

5    for the Kern River Ranger District of the Sequoia National Forest, United

6    States Forest Service. She is sued in her official capacity. Although Ms.

7    Chapman did not sign the Decision Memo issued in May 2025 that is

8    challenged in this case, she is now the official responsible for implementing

9    that decision and is therefore the proper defendant for purposes of

10    prospective relief.

11    17.    **Defendant Brooke Rollins, Secretary of Agriculture.** Defendant

12    Brooke Rollins is the Secretary of the United States Department of

13    Agriculture and is sued in her official capacity. The Forest Service is an

14    agency within the U.S. Department of Agriculture, and Secretary Rollins has

15    ultimate oversight authority over the Forest Service. Secretary Rollins is

16    responsible for ensuring that the Department of Agriculture and its agencies

17    – including the Forest Service – comply with all relevant federal laws in their

18    programs and decisions, including those challenged in this lawsuit.

19

20    **LEGAL BACKGROUND**

21    18.    **National Environmental Policy Act (NEPA).** NEPA embodies a

22    "hard-look" requirement, obligating all federal agencies to evaluate and

1   disclose the environmental consequences of proposed actions before making

2   an irretrievable commitment of resources. 42 U.S.C. § 4332(2)(C); 40 C.F.R.

3   §§ 1500.1(a), 1501.3(a). For actions that may significantly affect the quality of

4   the human environment, an agency must prepare a detailed Environmental

5   Impact Statement (EIS). If significance is uncertain, the agency must first

6   prepare an Environmental Assessment (EA) to determine whether an EIS is

7   necessary. 40 C.F.R. §§ 1501.5, 1501.6. An agency may rely on a categorical

8   exclusion (CE) only when the action fits a listed category of normally

9   insignificant activities *and* when no "extraordinary circumstances" indicate

10  the potential for significant impacts — individually or cumulatively — to

11  resources such as threatened species or congressionally designated areas. 36

12  C.F.R. § 220.6; 40 C.F.R. § 1501.4. Forest Service regulations specifically

13  specify Wild and Scenic Rivers as resources triggering the extraordinary

14  circumstances exception. 36 C.F.R. § 220.6(b).

15  19.    **Indirect and Cumulative Effects under NEPA.** NEPA requires

16  analysis not only of direct impacts but also of indirect effects that are

17  "reasonably foreseeable" and caused by the action, even if later in time or

18  farther removed in distance, and of cumulative impacts when the incremental

19  effect of the action is added to other past, present, and reasonably foreseeable

20  future actions. 40 C.F.R. §§ 1508.1(g)(2), 1508.1(g)(3). Agencies may not

21  segment connected or interdependent activities to avoid a full analysis and

22  may not invoke a CE when such effects could be significant.

1    20.    **Wild and Scenic Rivers Act (WSRA).** Section 7 of the WSRA

2    prohibits any federal assistance for a "water resources project" that would

3    have a direct and adverse effect on a designated river's free-flowing condition,

4    water quality, or Outstandingly Remarkable Values ("ORVs"), and further

5    bars any such project located above or below a designated reach if it would

6    invade or unreasonably diminish those values. 16 U.S.C. § 1278(a). Before

7    authorizing, funding, or conducting a water resources project that may affect

8    a designated river, the responsible federal agency must prepare a Section 7

9    determination affirming that the project will not violate these substantive

10    standards.

11    21.    **Forest Service WSRA Regulations.** A project that would remove

12    water from, return water to, or otherwise modify the flow of a designated

13    river constitutes a water resources project subject to Section 7 review. The

14    Forest Service, as administering agency for the NFKR, has adopted

15    regulations requiring a formal Section 7 evaluation for any project —

16    including those downstream or outside the Wild and Scenic River corridor —

17    that may unreasonably diminish ORVs within the designated segment. 36

18    C.F.R. § 297.5.

19    22.    **Administrative Procedure Act (APA).** The APA provides the

20    waiver of sovereign immunity and the cause of action for plaintiffs

21    challenging federal agency action. 5 U.S.C. §§ 701–706. A court must "hold

22    unlawful and set aside" agency actions found to be "arbitrary, capricious, an

1   abuse of discretion, or otherwise not in accordance with law," or taken

2   "without observance of procedure required by law." *Id.* § 706(2)(A), (2)(D).

3   NEPA and WSRA compliance are reviewed under this deferential but

4   searching APA standard.

5   23.    **Presumptive Remedy.** Under the APA, the presumptive remedy for

6   NEPA or WSRA violations is vacatur and remand. Courts may also grant

7   injunctive relief where necessary to prevent irreparable environmental harm

8   or preserve the protective purposes of the statutes.

9

10                      **FACTUAL ALLEGATIONS**

11   24.    **The Kern River Fish Hatchery and Its Water Demand.** According

12   to CDFW's environmental documentation, the Hatchery had long functioned

13   as a fish holding and distribution center or planting base prior to the March

14   2019 failure of its siphon. Hatchery operations require approximately 30-40

15   cfs of cool water delivered *via* a dedicated siphon pipeline at the KR3 tailrace.

16   California Department of Fish and Wildlife, *Kern River Hatchery Siphon*

17   *Replacement Project: Initial Study / Mitigated Negative Declaration*, July 24

18   2024 (hereinafter "CDFW 2024 IS-MND"), pp. 2-1 through 2-7.[1]

19   25.    **Location of Hatchery in Relation to KR3 Diversion.** KR3 is a

20   run-of-river hydroproject, diverting water out of the NFKR at Fairview Dam

---

[1] Link: https://nrm.dfg.ca.gov/FileHandler.ashx?DocumentID=212345 (accessed 09MAY25)

1    and conveying that water 16 river miles downstream to its powerhouse.

2    Water at the KR3 tailrace is cooler than water naturally delivered by the

3    NFKR as the KR3 conveyance decreases the exposure of diverted water to

4    thermal effects (primarily solar and air temperature). Southern California

5    Edison, *Kern River No. 3 Final License Application*, November 2024, Vol. II,

6    Pt. I. (hereinafter "SCE 2024 FLA")[2] at pp. 7-11, 7-87 & 7-96.

7    26.    **The Hatchery Flow Diversion.** The Hatchery extends its siphon to

8    the KR3 tailrace rather than a site in the NFKR closer to its operations to

9    use the "cooler" water at the tailrace. SCE 2024 FLA at 7-11.[3] Under Article

10    406 of the governing FERC license, SCE must make available 35 cfs of water

11    from Fairview Dam at the KR3 tailrace for the Hatchery, lest CDFW specify

12    it not needed for operations. *Id.* at 5-36; Southern California Edison,

13    *Notification of Agency Approval of Temporary Modification of Hatchery Flow*

14    *Requirement under Article 406*, FERC Accession No. 20220728-5025, July 27,

15    2022[4] (hereinafter "SCE 2022 HD Variance request"). In practice, SCE

16    diverts an additional 5-10 cfs "buffer" to ensure instantaneous delivery of at

---

[2] Link: https://www.sce.com/sites/default/files/custom-files/PDF_Files/P-2290_KR3_FLA_Vol-II_Ex-E_Public_Part1of4.pdf (accessed 14MAY25).

[3] See also FERC & USFS, *Kern River No.3 Environmental Assessment*, 1996 at 34 ("25 cfs is always diverted at Fairview Dam by Edison for the CDFG Kern River fish hatchery. This provides a relatively cool source of water for the hatchery."). Link: https://elibrary.ferc.gov/eLibrary/filelist?accession_number=19960409-0312 (accessed May 15, 2025).

[4] Link: https://elibrary.ferc.gov/eLibrary/filelist?accession_number=20220728-5025 (accessed May 15, 2025).

1   least 35 cfs, increasing the Hatchery diversion to 40-45 cfs. SCE 2024 FLA at

2   5-36.

3       27.   **Relationship Between Hatchery Flow and NFKR Minimum**

4   **Instream Flow.** The KR3 license also obligates SCE to release an MIF to the

5   NFKR below Fairview Dam — ranging from 40 cfs in winter to 130 cfs,

6   depending on the month, or natural inflows if less than those targets.

7   However, whenever inflows are insufficient to satisfy both the MIF and the

8   Hatchery diversion, the latter takes precedence, depressing flows below levels

9   that would otherwise be required by the MIF. *Ibid*. Inflows are typically

10  insufficient to satisfy both during ecologically critical flow periods of hot

11  summer months in drier years. Southern California Edison, *KR3 WR-2*

12  *Hydrology Study Dataset: WY 1997-2023*, Kern River No. 3 Relicensing

13  Website, 2024[5] (hereinafter "SCE 2024 KR3 Hydrology Dataset"); Kern River

14  Boaters, *Response to SCE's Draft License Application*, 2024[6], FERC Accession

15  No. 20241001-5282 (hereinafter "KRB 2024 DLA Response") at pp. 57-58, 62

16  (graphs plotting days in which Hatchery flow reduced the NFKR below

17  Fairview Dam MIF by month and year during current KR3 license period;

18  graph of mean inflow at Fairview Dam by water year during same). In

19  practice, the Hatchery diversion has reduced flows in the NFKR below

---

[5] Link: https://www.sce.com/sites/default/files/custom-files/PDF_Files/KR3_Hydrology%20Dataset_1997-2023.xlsx (accessed May 15, 2025). SCE KR3 Website: https://sce.com/kr3.
[6] https://elibrary.ferc.gov/eLibrary/filelist?accession_number=20241001-5282. (accessed May 15, 2025).

1    Fairview Dam down to as little as 39% of the MIF: On September 13, 2019,

2    SCE diverted a constant 41 cfs from Fairview Dam for the Hatchery while

3    natural inflow (and thus the MIF) was at 67 cfs, leaving only 26 cfs in the 15-

4    mile Wild and Scenic reach. SCE 2024 KR3 Hydrology Dataset; KRB 2024

5    DLA Response at p. 56 (graph plotting NFKR MIF, Hatchery diversion, and

6    NFKR flow below Fairview Dam in August-September 2015). Flows of only 26

7    cfs in the river — more than 70 cfs below that month's MIF target — severely

8    degrades the riverine environment.

9    28.    **Hatchery Diversion Flow Reductions Harm the Natural**

10    **Environment.** Hatchery diversion reductions to the NFKR MIF have

11    already harmed and, if restarted, will again harm the natural environment of

12    the North Fork Kern River by elevating water temperatures, depressing

13    dissolved-oxygen concentrations, and shrinking wetted riffle-and-pool

14    habitat. Scientific literature demonstrates that even modest summertime

15    flow reductions in dewatered reaches can (a) drive exponential temperature

16    increases as discharge declines, Satzinger, U., & Bachmann, D., *The Role of*

17    *High Water Temperature in the Context of Low-Flow Risk Analysis*, Water

18    17:1247, 2025[7]; (b) limit reaeration and trigger chronic low-DO conditions,

19    U.S. Environmental Protection Agency, *Dissolved Oxygen*, *CADDIS: Sources,*

20    *Stressors & Responses*, EPA Web Guidance, 2024[8]; and (c) stunt growth or

[7] Link: https://www.mdpi.com/2073-4441/17/9/1247 (accessed May 14, 2025).
[8] Link: https://www.epa.gov/caddis/dissolved-oxygen (accessed May 14, 2025).

1    cause mortality in cold-water fishes such as trout when base-flows are

2    reduced, California Department of Fish and Wildlife, *Drought Stressor*

3    *Monitoring Case Study: Dissolved Oxygen in the San Joaquin & Stanislaus*

4    *Rivers*, 2016[9] (documents fish kills from low-flow DO crashes); Nuhfer, A. J.,

5    Zorn, T. G., Wills, T. C., & Rosenthal, L., *Effects of reduced summer flows on*

6    *the brook trout population and temperatures of a groundwater-influenced*

7    *stream*, Ecology of Freshwater Fish:26(1), 2017 (flow cut stunted trout

8    growth.[10] SCE's Instream Flow Incremental Methodology study on the NFKR

9    below Fairview Dam shows that usable trout habitat declines sharply when

10    discharge falls below the summer MIF. Exhibit A-4, Fig. 4. These adverse

11    physical changes from flow reductions diminish the river's Scenic and

12    Wildlife ORVs. See ¶ 33.

13    29.    **Hatchery Diversion Flow Reductions Harm the Recreational**

14    **Environment.** Hatchery diversion reductions to the NFKR MIF have

15    harmed and, if restarted, will again harm the recreational environment:

16    specifically, human experience of scenery, whitewater boating, and

17    angling. Flow reductions decrease river depths, slow river speeds, increase

18    exposures of shorelines and channel boulders, decrease the incidence of

19    drops, riffles and runs, and increase the likelihood of algae or other pond

---

[9] Link: https://wildlife.ca.gov/Drought/Projects/San-Joaquin (accessed May 14, 2025).
[10] Link: https://www.researchgate.net/publication/290448460 (accessed May 13, 2025).

1  scum formation by stagnating pools. As a result, subjective aesthetic

2  experiences of river beauty may decline sharply when flows drop below

3  adequate ranges. Whittaker, D. & Shelby, B., *Flows and Aesthetics: A Guide*

4  *to Concepts and Methods*, National Park Service and Hydropower Reform

5  Coalition, 2017 (exposed channel and stagnant pools at low flows reduce

6  perceived scenic quality).[11] Similarly, flow reductions below summer MIF

7  increase boulder and shoal exposures that pinch or preclude navigable lines.

8  They also drop fish-holding riffles to warm, shallow puddles, increasing

9  predation and slashing catch rates to the detriment of the angling experience.

10  Empirical flow-preference studies show that once flows fall below users'

11  acceptable range, recreation quality scores and participation rates in angling

12  and whitewater boating decline rapidly. Whittaker, *et al.*, *Flows and*

13  *Recreation: A Guide to Studies for River Professionals,* 2005.[12] These harms to

14  aesthetics, whitewater boating, and angling impair the river's Recreation and

15  Scenic ORVs. See ¶ 33.

16  30.  **Hatchery Siphon Failure and Facility Closure (2019-2020).** The

17  Hatchery's dedicated siphon pipeline failed in March 2019, precluding

18  operations. CDFW 2024 IS-MND at 2-1 & 2-2. On November 23, 2020, CDFW

19  publicly announced the December 01, 2020 closure of the hatchery until the

---

[11] Link: https://hydroreform.org/wp-content/uploads/2020/05/Flows-and-aesthetics-A-guide-to-concepts-and-methods-2017_Final_web.pdf (accessed May 15, 2025).
[12] Link: https://hydroreform.org/wp-content/uploads/2020/05/flowrec.pdf (accessed May 27, 2025).

1    siphon was repaired. *Id*. at 2-13.[13] Despite the cessation of operations, the

2    40–45 cfs Hatchery diversion continued for more than two years, due to

3    agency inaction. From March 2019 forward, therefore, the Hatchery diversion

4    served no designated beneficial purpose, and — but for administrative delay

5    — that water should have remained instream.

6    31.    **Agency Steps Suspending the Hatchery Flow (2021-2022) and**

7    **Establishing a New Baseline.** In May 2021, KRB formally requested that

8    CDFW suspend the Hatchery diversion under License Article 406. At first,

9    CDFW declined. However, in January 2022, CDFW notified FERC that the

10    siphon was inoperable and requested suspension of the diversion due to lack

11    of beneficial use. California Department of Fish and Wildlife, *Letter re Article*

12    *406 Hatchery Flow Suspension*, FERC Accession No. 20220110-5025, 2022. In

13    July 2022, river inflows dropped to the point the Hatchery diversion began

14    depleting the MIF again. KRB notified CDFW of this fact on July 11 (KRB

15    email, July 11, 2022), and on July 27, SCE filed with FERC for a temporary

16    variance and stopped the Hatchery diversion that day. SCE 2022 HD

17    Variance Request. FERC approved the variance on July 27, 2023. FERC,

18    *Order Modifying and Approving Variance pf Article 406 Hatchery Flow*

19    *Requirement*, 184 FERC ¶ 61,051 (hereinafter "FERC 2023 Variance

---

[13] See also CDFW public announcement:
https://www.facebook.com/CaliforniaDFW/posts/pfbid037EVxpuLy8DajJJxC
mbyjPn7YVVYU9zonGHpoUKwWDHsbseCEdXk7AjPuT66Bndrvl (accessed
May 15, 2025).

1    Approval").[14] Since July 2022, the 40-45 cfs Hatchery diversion has not

2    reduced instream flows below the MIF in the Wild and Scenic NFKR; a year

3    later, FERC formalized the suspension in its Variance Approval Order. SCE

4    2022 Variance Request; FERC 2023 Variance Approval; SCE 2024 KR3

5    Hydrology.

6    32.    **Forest Service Approval Without NEPA or WSRA Analysis.** On

7    May 7, 2025, the Forest Service authorized CDFW's replacement of the

8    Hatchery siphon under a categorical exclusion for "Approval, modification, or

9    continuation of special uses that require less than 20 acres of NFS [National

10   Forest System] lands," 36 C.F.R. § 220.6(e)(3). The Forest Service authorized

11   the project in a Decision Memo that was *not* accompanied by an

12   Environmental Assessment, an Environmental Impact Statement, or a Wild

13   and Scenic Rivers Act § 7 determination. U.S. Forest Service, *Decision Memo:*

14   *Kern River Hatchery Siphon Replacement Project*, Sequoia National Forest,

15   Project 67241, May 7, 2025[15] (hereinafter "USFS 2025 Siphon Decision"), p. 2.

16   The Decision Memo, which states that construction is expected to commence

17   late summer 2025, contains no analysis of the decision's foreseeable reduction

18   in instream flows and accompanying water-quality and aesthetic impacts to

19   the Wild and Scenic North Fork Kern River below Fairview Dam once the 40-

---

[14] Link:
https://elibrary.ferc.gov/eLibrary/filelist?accession_number=20230727-3044.
(accessed May 15, 2025).
[15] Link: https://www.fs.usda.gov/project/?project=67241 (accessed May 09, 2025).

1    45 cfs Hatchery diversion resumes. *Id.* Prior to the Decision Memo, KRB

2    submitted detailed written comments to the Forest Service: (a) warning that

3    resuming the 40-45 cfs diversion could adversely affect the water quality and

4    ORVs of the Wild and Scenic NFKR and thus required a WSRA § 7 analysis,

5    (b) objecting that the Forest Service could not rely on a categorical exclusion

6    and instead must prepare at least an Environmental Assessment under

7    NEPA's extraordinary circumstances exception. Kern River Boaters,

8    *Comments on the Proposed Action and Use of Categorical Exclusion for the*

9    *Kern River Fish Hatchery Siphon Replacement,* February 18, 2025, attached

10    as Exhibit A.

11    33.    **Predictable Harm to Wild & Scenic Values.** Resuming the 40-45

12    cfs hatchery diversion during hot, dry summers will again depress flows

13    below the river's MIF, resulting in higher water temperatures, lower

14    dissolved oxygen, reduced trout habitat, and degraded angling and scenery —

15    all core Outstandingly Remarkable Values of this Wild & Scenic segment of

16    the NFKR. U.S. Forest Service, *Final Environmental Impact Statement North*

17    *and South Forks of the Kern Wild and Scenic River*, 1994[16] (hereinafter

18    "USFS 1994 WSR FEIS"), "Purpose & Need" at 2 (identifying ORVs for this

19    river segment as "Scenic Recreation Wildlife"); *Id.*, "Affected Environment" at

20    61 (specifying ORVs for this river segment to "include fishing, camping,

---

[16] Link: https://www.rivers.gov/apps/sites/rivers/files/documents/plans/kern-plan.pdf (accessed May 12, 2025).

1    picnicking, Whitewater boating, hiking, driving for pleasure, and enjoying the

2    scenic beauty").

3    34.    **Kern River Boaters' Narrow Objective.** Plaintiff Kern River

4    Boaters does not oppose the rehabilitation and operation of the CDFW Kern

5    River Fish Hatchery. Rather, KRB seeks only to ensure that the resumption

6    of hatchery operations does not reverse improved current conditions in which

7    the Hatchery diversion no longer takes flows from the river's minimum

8    instream flow regime. Procedurally, repair of the siphon on Forest Service

9    lands must undergo full review under NEPA and the Wild & Scenic Rivers

10    Act to protect the river's designated values against the harm resulting

11    Hatchery operations will reasonably and foreseeably impose. After such

12    review, KRB would not oppose approval of the Siphon Project conditioned

13    upon the preclusion of hatchery operations that take flows from the NFKR

14    MIF.

15

16                            **CLAIMS FOR RELIEF**

17    **COUNT I – Violation of Section 7 of the Wild and Scenic Rivers Act**

18    **(16 U.S.C. § 1278) (Administrative Procedure Act, 5 U.S.C. § 706(2))**

19    35.    **Incorporation of Allegations.** Plaintiff realleges and incorporates by

20    reference paragraphs 1 through 34 as if fully set forth herein.

21    36.    **WSRA § 7 Requirements.** Section 7 of the Wild and Scenic Rivers Act

22    ("WSRA") requires federal agencies to evaluate any water resources project

23    that "may affect" a designated Wild and Scenic River's outstandingly

1    remarkable values ("ORVs"), and it forbids agency support for any project

2    that would have a "direct and adverse effect" on those values. 16 U.S.C.

3    § 1278(a). An agency must make this determination prior to project approval.

4    37.    **WSRA Protection for the Kern River.** The 15-mile segment of the

5    NFKR below Fairview Dam at issue is designated as a Wild and Scenic River

6    and is managed by the Forest Service for its ORVs, including recreation,

7    scenery, wildlife, fishing, camping, picnicking, hiking, driving for pleasure,

8    and enjoying the scenic beauty. (Complaint ¶ 33.) Accordingly, before

9    approving any water resources project that may affect this segment, the

10   Forest Service must affirmatively determine that the project will not

11   unreasonably diminish the river's designated values.

12   38.    **The Hatchery Siphon Project.** The Siphon Project is a water

13   resources project that involves the construction of a new siphon intake to

14   divert water from the NFKR a mile downstream of the Wild and Scenic River

15   segment. Resuming those operations will reactivate a dormant diversion of

16   approximately 40–45 cfs at Fairview Dam, affecting 15 miles of Wild and

17   Scenic river. (Complaint ¶¶ 26, 31.) As Hatchery operations depend upon this

18   diversion, this diversion has served no designated beneficial purpose since

19   the siphon failed March 2019, and it has been inactive since July 2022.

20   (Complaint ¶¶ 30-31). Because the Hatchery cannot resume operations

21   unless the siphon delivers cool water from Fairview Dam at the KR3 tailrace,

22   approval of the Siphon Project is the *sine qua non* for reinstating the 40–45

1    cfs diversion. This diversion will remove water that now remains in the 15-

2    mile Wild and Scenic reach whenever natural inflow is too low to satisfy both

3    Hatchery demand and the NFKR MIF.

4    39.    **Impact on River Flows and Water Quality.** The Hatchery

5    diversion is a significant reduction in flow. As alleged above, this reduction

6    will predictably occur during ecologically critical low-flow periods, leading to

7    higher water temperatures and lower concentrations of dissolved oxygen,

8    harming water quality, aquatic habitat, and aesthetics. (Complaint ¶¶ 27-29.)

9    40.    **Impact on Outstandingly Remarkable Values.** These flow

10   reductions will harm the river's ORVs, including fisheries and wildlife — due

11   to worsened water quality — and recreation and scenery — due to lower flows

12   and exposed riverbed. These harms are precisely the types of impacts that

13   trigger the WSRA's Section 7 protections.

14   41.    **Forest Service's Failure to Perform a WSRA § 7 Analysis.**

15   Plaintiff KRB raised these specific WSRA concerns during the Project's

16   administrative review. In a formal comment letter submitted to the Forest

17   Service on February 18, 2025, KRB warned that resuming the Hatchery

18   diversion could adversely affect flows, water quality, fisheries, wildlife, and

19   recreation – all ORVs or necessary conditions for such in the NFKR below

20   Fairview Dam — and urged the Forest Service to conduct a WSRA § 7

21   evaluation before approving the Project. (Complaint ¶ 32). Despite this

1    notice, the Forest Service approved the Siphon Project without conducting a

2    WSRA § 7 evaluation or issuing any written determination. (Complaint ¶ 32).

3    42.    **Violation of WSRA § 7 and APA.** The Forest Service's failure to

4    perform a § 7 analysis violated the WSRA. 16 U.S.C. § 1278(a). The agency's

5    May 7, 2025 Decision Memo contains only a cursory statement that the

6    project would have "no significant impact," but it lacks any formal hydrologic

7    or ORV analysis. Because the agency authorized the project without the

8    process and findings required by WSRA, its decision must be held unlawful

9    and set aside under the APA. 5 U.S.C. § 706(2).

10   **COUNT II — Violation of NEPA (Improper Categorical Exclusion and**

11   **Failure to Consider Environmental Impacts)**

12   43.    **Incorporation of Allegations**. Plaintiff realleges and incorporates by

13   reference paragraphs 1 through 42 as if fully set forth herein.

14   44.    **NEPA Requirements.** The National Environmental Policy Act

15   ("NEPA") requires federal agencies to take a "hard look" at the environmental

16   consequences of their actions — including indirect and cumulative effects —

17   before committing resources to a project. (Complaint ¶¶ 18–19.) Under NEPA

18   and the Forest Service's implementing regulations, an action may be

19   categorically excluded from detailed environmental review only if it fits

20   within a designated exclusion category and no extraordinary circumstances

21   exist that suggest potentially significant environmental impacts. 40 C.F.R. §

22   1501.4; 36 C.F.R. § 220.6(a)–(b).

1    45.    **Improper Use of Categorical Exclusion.** In approving the Siphon

2    Project, the Forest Service invoked a "categorical exclusion" under 36 C.F.R. §

3    220.6(e)(3) – a category for minor special-use authorizations – and issued a

4    Decision Memo without preparing an Environmental Assessment or

5    Environmental Impact Statement. (Complaint ¶ 32.) The agency failed to

6    assess whether extraordinary circumstances — particularly those related to

7    Wild and Scenic River protections — precluded reliance on this exclusion.

8    46.    **Wild & Scenic River as Extraordinary Circumstance.** The

9    existence of the 15-mile Wild and Scenic River segment below Fairview Dam

10   — and the Siphon Project's potential to degrade its flows and ORVs  —

11   constituted an "extraordinary circumstance" under NEPA regulations. Forest

12   Service rules explicitly identify Wild and Scenic Rivers as protected resources

13   requiring case-by-case review. 36 C.F.R. § 220.6(b)(1)(i). Because the Siphon

14   Project would enable a diversion that predictably reduces flows during dry-

15   season low inflows, its impacts on fisheries, recreation, and scenery should

16   have precluded use of a CE.

17   47.    **Failure to Take a "Hard Look" at Indirect and Cumulative**

18   **Effects.** The Forest Service also failed to take the requisite hard look at the

19   Siphon Project's indirect and cumulative environmental impacts. The

20   agency's Decision Memo contains no analysis of the reasonably foreseeable

21   reduction in instream flow that will occur once the 40–45 cfs hatchery

22   diversion resumes. (Complaint ¶¶ 27, 30.) By facilitating that diversion, the

1    Siphon Project will predictably depress flows below the MIF during summer

2    months in dry years — an indirect environmental effect that NEPA mandates

3    agencies to evaluate. The resulting harm to water quality, aquatic habitat,

4    and recreational uses constitutes indirect degradation, and cumulative

5    degradation when combined with existing flow regulation and climate

6    conditions. (Complaint ¶¶ 28–29, 31.)

7    48.    **NEPA Violation – Significant Effects Ignored.** Given these

8    potential impacts, the Siphon Project may significantly affect the

9    environment, particularly a congressionally designated Wild and Scenic

10    River. Under NEPA, such a context demands at least an Environmental

11    Assessment. The Forest Service's reliance on a categorical exclusion —

12    without meaningful environmental review — violated NEPA and its

13    implementing regulations.

14    49.    **Arbitrary and Capricious Action.** The Forest Service's approval of

15    the Siphon Project under a categorical exclusion, without evaluating

16    reasonably foreseeable environmental impacts or assessing whether

17    extraordinary circumstances were present, was arbitrary and capricious, an

18    abuse of discretion, and contrary to law. Accordingly, the agency's action

19    must be held unlawful and set aside under the APA. 5 U.S.C. § 706(2).

20

21    **PRAYER FOR RELIEF**

1    WHEREFORE, Plaintiff Kern River Boaters respectfully requests that the

2    Court enter judgment in its favor and grant the following relief:

3    1. Declare that the U.S. Forest Service's May 7, 2025 "Decision Memo—Kern

4    River Hatchery Siphon Replacement Project" was adopted in violation of:

5        a. Section 7 of the Wild and Scenic Rivers Act, 16 U.S.C. § 1278; and

6        b. The National Environmental Policy Act and its implementing

7        regulations, 42 U.S.C. § 4332, 40 C.F.R. Parts 1500–1508, and 36

8        C.F.R. Part 220; and are arbitrary, capricious, an abuse of discretion,

9        and otherwise not in accordance with law.

10   2. Set aside and vacate the Decision Memo and all associated approvals,

11   permits, or authorizations issued for the Siphon Project, pursuant to the

12   Administrative Procedure Act, 5 U.S.C. § 706(2).

13   3. Issue temporary, preliminary, and permanent injunctive relief, including a

14   temporary restraining order, prohibiting implementation of the Siphon

15   Project or operation of the Hatchery diversion until Defendants have fully

16   complied with WSRA § 7 and NEPA, and specifically enjoining:

17       a. Any ground-disturbing activities, construction, infrastructure

18       installation, or water-withdrawal operations related to the Kern River

19       Hatchery Siphon Replacement Project; and

20       b. Any resumption or authorization of the Hatchery diversion that

21       reduces instream flows in the Wild and Scenic North Fork Kern River

1          until natural inflow is sufficient to meet both the Hatchery demand

2                  and the minimum-instream flow requirement.

3     4. Remand the matter to the Forest Service with instructions to prepare a

4     legally sufficient WSRA § 7 determination and NEPA-compliant

5     environmental analysis (Environmental Assessment or Environmental

6     Impact Statement), including evaluation of direct, indirect, and cumulative

7     impacts, as well as alternatives and mitigation measures consistent with

8     statutory mandates.

9     5. Award Plaintiff its reasonable costs, expenses, and attorneys' fees

10    pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and any other

11    applicable authority.

12    6. Grant such other and further relief as the Court deems just and proper and

13    retain jurisdiction to ensure compliance with its orders.

14

1    Dated: May 28, 2025

2    Respectfully submitted,

3    /s/ Brett Duxbury

4    Brett Duxbury (Calif. Bar No. 155268)

5    brettduxbury@mac.com
6    P.O. Box 1938
7    Kernville, CA 93238
8    Phone: 760.376.1905
9    Attorney for Plaintiff Kern River Boaters